UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

AMY BARBOZA
         Plaintiff,

v.                                      C.A. No. 07-339-ML

TOWN OF TIVERTON; JAMES AMARANTES,
TREASURER; LOUISE DURFEE, PRESIDENT
OF TOWN COUNCIL; W. GLENN STECKMAN III,
TOWN ADMINISTRATOR; THOMAS BLAKEY,
CHIEF OF POLICE
         Defendants.

## MEMORANDUM AND ORDER

Plaintiff Amy Barboza ("Plaintiff") brings this action against the Town of Tiverton;

James Amarantes, Treasurer; Louise Durfee, President of the Town Council; W. Glenn Steckman

III, Town Administrator; and Thomas Blakey, Chief of Police ("Defendants"), alleging that she

was subjected to disparate treatment on account of her gender, a hostile work environment and

retaliation for protected activity.  The matter is before the Court on Defendants' motion for

summary judgment.

### I.  Standard of Review

Summary judgment is appropriate only "if the pleadings, the discovery and disclosure

materials on file, and any affidavits show that there is no genuine issue as to any material fact and

that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)(2).  An issue is

"genuine" if the pertinent evidence is such that a rational fact finder could resolve the issue in

favor of either party, and a fact is "material" if it "has the capacity to sway the outcome of the litigation under the applicable law." National Amusements, Inc. v. Town of Dedham, 43 F.3d 731, 735 (1st Cir. 1995). The moving party bears the burden of showing the Court that no genuine issue of material fact exists. Id. Once the movant has made the requisite showing, the non-moving party "may not rely merely on allegations or denials in its own pleading; rather, its response must — by affidavits or . . . otherwise . . . set out specific facts showing a genuine issue for trial." Fed. R. Civ. P. 56(e)(2). "The mere existence of a scintilla of evidence in favor of the non[-]moving party is insufficient to defeat summary judgment." Barreto-Rosa v. Varona-Mendez, 470 F.3d 42, 45 (1st Cir. 2006) (internal quotation marks and citation omitted). The Court views the record and draws all reasonable inferences in the light most favorable to the non-moving party. Continental Casualty Co. v. Canadian Universal Insurance Co., 924 F.2d 370 (1st Cir. 1991).

"In opposing a motion for summary judgment, a plaintiff must proffer admissible evidence that could be accepted by a rational trier of fact as sufficient to establish the necessary proposition." Gorski v. New Hampshire Department of Corrections, 290 F.3d 466, 475-76 (1st Cir. 2002); see also Fed. R. Civ. P. 56(e). "[T]he First Circuit will reject responses by non[-]movants that adduce statements not based on personal knowledge or that adduce conjectural or conclusory allegations." Bennet v. City of Holyoke, 230 F. Supp. 2d 207, 214 (D. Mass. 2002) (internal quotation marks and citation omitted), aff'd, 362 F.3d 1 (1st Cir. 2004).

Courts must be cautious in granting an employer's motion for summary judgment in employment discrimination cases where a plaintiff makes out a prima facie case and the issue becomes whether the employer's articulated non-discriminatory reason is a pretext for

2

discrimination. Hodgens v. General Dynamics Corp., 144 F.3d 151 (1st Cir. 1998). Summary judgment may be appropriate, however, where an employee's pretext evidence is particularly weak. Douglas v. J.C. Penney Co., Inc., 422 F. Supp. 2d 260 (D. Mass. 2006), aff'd, 474 F. 3d 10 (1st Cir. 2007). Furthermore, even though the non-moving party enjoys the benefit of all reasonable inferences, judgment as a matter of law for the moving party is appropriate "[e]ven in employment discrimination cases where elusive concepts such as motive or intent are at issue . . . if the non-moving party rests merely upon conclusory allegations, improbable inferences, and unsupported speculation." Feliciano de la Cruz v. El Conquistador Resort and Country Club, 218 F.3d 1, 5 (1st Cir. 2000). Where, however, the non-moving party has produced "something more, trial courts should use restraint in granting summary judgment where discriminatory animus is in issue." Douglas, 422 F. Supp. 2d at 272 (internal quotation marks and citation omitted). With these principles in mind, the Court considers Defendants' motion and Plaintiff's response.

## II.  Facts

### A.  Plaintiff's Employment with the Tiverton Police Department

Plaintiff was hired as a probationary police officer by the Town of Tiverton on November 28, 2005. The probationary period lasts for one year. During her tenure with the Tiverton Police Department ("Department"), Plaintiff was the only probationary officer and she was one of two uniformed female officers out of approximately twenty-eight uniformed officers. For the start of her active duty with the Department, Plaintiff was assigned to work with a field training officer. Lieutenant Patrick Jones ("Jones") was in charge of the field training officers who supervised Plaintiff. Field training provides a new officer with "on the job training" by a more experienced

3

officer.  Plaintiff completed her field training in or about July 2006.

Plaintiff was the subject of periodic evaluations during her employment.  Plaintiff's evaluations in July and August 2006 noted some problem areas in her performance as a police officer.  On August 30, 2006, Chief of Police Thomas Blakey ("Blakey") suspended Plaintiff for two days.  The notice of suspension was based upon Plaintiff's (1) entry into a "local licensed liquor establishment" and failing to "call out" her location to dispatch; (2) failure to report for duty without obtaining proper authorization for leave; (3) leaving early on a shift without authorization; (4) failure to take appropriate follow-up action on a domestic violence complaint; (5) failure to timely investigate a larceny complaint; (6) demeanor toward superior officers; and (7) failure to wear her hat as part of the uniform.[1]  In addition to the two-day suspension, Blakey advised Plaintiff that he was extending her probationary period three months, from November 28, 2006, to February 28, 2007.  Blakey also required Plaintiff to return to field training.

After the completion of her August 2006 two-day suspension, Plaintiff's evaluations continued to reflect problems with her performance.  On or about October 30, 2006, Jones

---

[1] Plaintiff attempts to dispute the incidents of deficient conduct and performance in Blakey's notice of suspension by stating that she does not remember the specific incident or by attempting to rebut the incident with self-serving inadmissible statements.  For example, with respect to the failure to call out her location to dispatch, Plaintiff contends that she did not need to call out her vehicle to dispatch because she was visiting a business establishment to pick up "take-out" food.  Plaintiff's Exhibit 1, Amy Barboza Deposition at 31.  Beyond her own opinion however, Plaintiff does not refer the Court to any admissible evidence that would support her contention that she was not required to call out her location.  Plaintiff also contends she was told that she was disciplined because she visited a "liquor establishment" but Plaintiff argues that other officers visited restaurants and "[ate] there" and were not disciplined.  Id. at 12.  Plaintiff, however, does not identify who told her she was being disciplined for visiting a liquor establishment or how she was aware that other officers visited restaurants and were not disciplined.  Likewise, Plaintiff alleges that other officers did not wear their hats and were not disciplined but fails to inform the Court who these officers were or how she was aware that these officers did not wear their hats and were not disciplined.  Plaintiff's "evidence" consists of inadmissible claims that do little to rebut the infractions catalogued in the letter of suspension.  The Court does note, however, that with respect to the domestic violence complaint, Blakey admitted that Plaintiff's supervisor, a male, made a mistake and that her supervisor was "held responsible" while Plaintiff was not.  Plaintiff's Exhibit 2, Thomas Blakey Deposition at 33.  The notice of suspension, however, was based, in part, on Plaintiff's handling of the domestic violence complaint.

4

authored a letter to Deputy Chief of Police Nicholas Maltais ("Maltais") concerning Plaintiff's

performance as a probationary police officer.  In that letter, Jones noted Plaintiff's consistent

deficiencies in paperwork and with "not being aggressive in traffic enforcement."  Defendants'

Exhibit B, October 30, 2006, Jones Letter.  Jones also advised Maltais that Plaintiff showed a

lack of "following through" and a lack of "progressive performance" and that given the amount

of on-the-job training Plaintiff received, she should be at a "higher level of performance. . . ."  Id.

Jones concluded that while it was "regrettable," he felt "strongly that a decision regarding

[Plaintiff's] continued status as a police officer needs to be seriously reconsidered, not only due

to her lack of progress, but out of concern for her safety and the other officers of the department."

Id.[2]  Plaintiff's personnel record reflects, among other things, that Plaintiff experienced problems

relating to her (1) report writing; (2) failure to investigate adequately; (3) indifferent attitude; (4)

lack of progress in light of her experience; and (4) failure to follow orders.[3]

### B.  The Investigation into Complaints of Sexual Harassment Against Blakey

On or about October 18, 2006, the Tiverton Town Administrator, W. Glenn Steckman III

("Steckman"), commenced an investigation into complaints by female employees of the

Department that Blakey had sexually harassed them.[4]  Steckman appointed Maltais and Jones to

---

[2]Jones' letter also appears to make reference to, among other things, Plaintiff's failure to take appropriate action on the domestic violence complaint.

[3]Plaintiff does not specifically dispute all the allegations of deficient performance noted in her evaluations. In fact, Plaintiff admits that her "periodic evaluations speak for themselves."  Plaintiff's Statement of Material Undisputed Facts at 24.  In spite of Plaintiff's admission that the evaluations speak for themselves, Plaintiff contends that the evaluations are "inaccurate," "exaggerated," "falsely reported," and "colored by the fact that she was a female officer receiving intentionally inconsistent, unfair and contradictory training."  Plaintiff's Statement of Disputed Facts at 4, 10, 15.

[4]Defendants allege that Plaintiff "did not come forward on her own with" a complaint in the sexual harassment matter and that she reported her allegations to the Department only as part of the Department's internal investigation.  Defendants' Memorandum in Support of Summary Judgment at 21.  Defendants, however, do not

conduct the internal investigation.  As part of that investigation, Plaintiff was interviewed and she summarized what she believed were instances of inappropriate conduct by Blakey.  Maltais prepared a written report of the investigation and Steckman received a draft report of the investigation on November 15, 2006.  The report included Plaintiff's interview statements.

"[S]ometime in November 2006" Steckman met with Plaintiff so that he could determine what Plaintiff "believed the intentions" of Blakey were concerning the incidents that Plaintiff described during her interview.  Plaintiff's Exhibit 4, W. Glenn Steckman Deposition at 35. Steckman wanted to clarify whether Plaintiff "misinterpreted [Blakey's] intentions based on a generational issue. . . ."  Id.  Plaintiff alleges that, during this meeting, Steckman informed her that Blakey's conduct would result in a slap on the wrist.  Steckman, however, did not recall making this comment.  Plaintiff also contends that Steckman informed her that he had seen her "progress reports" and that he knew she had "problems" during her probationary period and that she had to "work hard" to prove that she was a good police officer.  Plaintiff's Exhibit 10, Charge of Discrimination.  It is not clear from the record whether Steckman admits that he made these statements.

After Steckman met with Plaintiff, he met with Blakey to discuss the allegations.  In November 2006 Steckman placed Blakey on administrative leave.  At some point in the "Fall of 2006," (Steckman could not remember the exact date) Maltais approached Steckman concerning Plaintiff's one-year "employment anniversary date."  Plaintiff's Exhibit 4, W. Glenn Steckman Deposition at 39; Plaintiff's Statement of Undisputed Facts at 19.  Steckman testified that

---

refer the Court to an affidavit or other evidence to support this claim. Plaintiff contends that she "was one of the complainants" in the sexual harassment matter. Plaintiff's Statement of Disputed Facts at 11. The Court must credit Plaintiff's assertion for purposes of deciding this motion.

Maltais and the town's legal counsel informed him that a police officer's "rights" change after

the police officer has been with the Department for one year.  Plaintiff's Exhibit 4, W. Glenn

Steckman Deposition at 39.  Steckman met with the president of the police officer's union, and

another officer who he thought may have been one of Plaintiff's training officers, to discuss

whether Plaintiff was "making it as a police officer, because if not, a decision needed to be made

whether she would stay with the [D]epartment or not."  Id. at 41.  Although Blakey had

purportedly extended Plaintiff's probationary period to February 28, 2007, Steckman was

informed by legal counsel that the collective bargaining agreement did not allow for the

unilateral extension of the probationary period by Blakey.

As part of the investigation into Blakey's behavior, Steckman reviewed the personnel

files of all the employees who complained about Blakey's behavior.  During that examination,

Steckman reviewed Plaintiff's personnel file.  Steckman testified that after examining Plaintiff's

personnel file, he "wonder[ed]" why she was on probation and believed that she "should have

been removed from the [D]epartment months ago."  Id. at 59.

Within one week after her meeting with Steckman, Plaintiff met with Maltais and two

other Tiverton police officers.  During this meeting Plaintiff was informed that the Department

"would give [her] the dignity of resigning. . . ."  Plaintiff's Exhibit 10, Charge of Discrimination.

After this meeting, Plaintiff contacted an attorney who forwarded a letter to Steckman, dated

November 17, 2006, alleging that Plaintiff was being subjected to discrimination, retaliation and

sexual harassment.  Id.  Plaintiff contends that after receiving this letter, Steckman and Maltais

forwarded her a letter (also dated November 17, 2006) informing her that she was being placed

on administrative leave and further instructing her that she was to report to Steckman's office on

November 27, 2006.

Steckman offered Plaintiff the opportunity to resign.  Steckman indicated that, if she resigned, she would have a "clean record" and an opportunity to apply to other police departments without the stigma of being terminated.  Plaintiff's Exhibit 4, W. Glenn Steckman Deposition at 46-47.  Plaintiff was terminated on November 27, 2006.  Steckman testified that Plaintiff was terminated as a result of a "performance issue." Id. at 54.  Since 2006, although there have been female applicants, the Department has hired six new male police officers.

Based upon the results of the internal investigation into the allegations of sexual harassment, Steckman determined that Blakey's behavior was inappropriate and terminated Blakey's employment in January 2007.  Blakey, however, appealed Steckman's termination decision to the Tiverton Town Council.  The Town Council held hearings, beginning in or about March 2007, on Blakey's appeal.  After several hearings, the Town Council decided to overrule Steckman's decision to terminate Blakey.  As a result, Blakey was reinstated as Chief of Police.

### C. Plaintiff's Allegations Against Blakey[5]

In her deposition, Plaintiff testified to several incidents that she perceived included inappropriate behavior by Blakey.  One of the incidents occurred when Plaintiff went to the police station to complete paperwork upon being advised that she was being hired by the Department.  While at the police station, Plaintiff alleges that Blakey rubbed her back and squeezed her shoulders and stated that he was "happy that they decided to hire another female officer, he need[ed] a personal touch in his office."  Plaintiff's Exhibit 1, Amy Barboza

---

[5]For purposes of this motion, Defendants assume, without conceding, the accuracy of Plaintiff's allegations.

Deposition at 43. Plaintiff was "shocked" by Blakey's behavior and was "pretty sure" she spoke

about the incident to the only other female officer in the Department. Id. at 45.

On another occasion, Plaintiff inquired of Blakey's secretary concerning the availability

of Department T-shirts. Plaintiff thought the incident occurred in the "warmer weather" during

2006, but was not sure if it was during the Spring of 2006. Id. at 46. Blakey overheard Plaintiff

and requested that she come into his office. After Plaintiff entered his office, Blakey closed the

door and asked Plaintiff whether she wanted "a large size for a boyfriend or not." Id. at 46.

Plaintiff informed Blakey that she only wanted a shirt for herself. Blakey obtained a shirt and

asked Plaintiff to "turn around so he could put it up against my back to see if it fit." Id. at 47.

Plaintiff testified that she was "shocked" by this behavior and did not think it was appropriate but

she did not know what to say and turned around to allow Blakey to put the T-shirt against her

back. Id. Blakey informed her that it "looks like it fits well." Id. Plaintiff testified that Blakey

held the shirt against her back for a "minute or so" while asking her if she wanted a "big one . . .

for a friend or boyfriend." Id. Plaintiff was not sure whether she discussed this incident with

anyone but stated that she might have discussed it with one of her training officers. During the

same meeting, Plaintiff contends that Blakey, with a "smirk on his face," informed Plaintiff that

he had met a member of the Tiverton Fire Department who asked him "who the new female

[police] officer with the nice ass was, and then he . . . laughed." Id. at 49. Plaintiff testified that

she was "shocked," felt uncomfortable, and "didn't know how [she] should address" Blakey's

comment and "just wanted to get out of there." Id.

On another occasion Plaintiff asked Blakey how his daughter was because Plaintiff had

worked with her before she began her employment with the Department. Blakey informed

9

Plaintiff that his daughter was doing well and told Plaintiff, while rubbing her cheek with his hand, that she was "pretty" and "beautiful." Id. at 50. Plaintiff felt uncomfortable and thought that Blakey's behavior was inappropriate. Plaintiff believed that Blakey was "making a . . . pass" at her. Id. at 51. Plaintiff stated that this incident occurred when she was assigned to the second shift but she does give a specific date of the incident. The record is not clear whether Plaintiff informed anyone of this incident.

Plaintiff also witnessed Blakey rub the shoulders of a female dispatcher on "five or more" occasions. Id. at 40. Plaintiff, however, does not assign any specific date or dates to these incidents. Plaintiff also testified that Officer Melissa Rippa ("Rippa"), the only other female officer in the Department, told her that Blakey asked Rippa if Rippa liked to wear "thongs or regular underwear and what color they were, if they were red or not." Id. at 41. Plaintiff also alleges that she heard about an incident, before she was hired, where Blakey dressed up as Santa Claus and said that he had a candy cane for the dispatchers and "for them to sit on his lap." Id.

### III. Analysis

Plaintiff's complaint alleges violations of Title VII, 42 U.S.C. § 2000e et. seq., the Rhode Island Fair Employment Practices Act ("FEPA"), R.I. Gen. Laws § 28-5-1 et. seq., the Rhode Island Civil Rights Act of 1990 ("RICRA"), R.I. Gen. Laws § 42-112-1 et. seq. and the Rhode Island Whisteblower Protection Act ("RIWPA"), R.I. Gen. Laws § 28-50-1 et seq. With respect to Plaintiff's Title VII, FEPA and RICRA claims, Plaintiff's case has three main themes: disparate treatment, hostile work environment and retaliation. The Court will analyze the Title VII, FEPA, and RICRA actions together. Babbitt v. PRI XVII, L.P., C.A. No. 07-274 S, 2009 WL 3450959 (D.R.I. Oct. 26, 2009); Horn v. Southern Union Co., C.A. No. 04-434 S, 2008 WL

2466696 at * 7 n.5 (D.R.I. June 18, 2008) (noting that case law "developed under Title VII . . . is routinely applied to claims brought pursuant to FEPA and RICRA") (internal quotation marks and citation omitted).

## A. Hostile Work Environment

To prove a claim of hostile work environment sexual harassment, a plaintiff must demonstrate: (1) that she is a member of a protected class; (2) that she was the subject of unwelcome sexual harassment; (3) that the harassment was based upon sex; (4) that the harassment was "sufficiently severe or pervasive so as to alter the conditions of plaintiff's employment and create an abusive work environment;" (5) that the sexually objectionable conduct was both objectively and subjectively offensive, such that a reasonable person would find it hostile or abusive and the plaintiff perceived it to be so; and (6) that a basis for employer liability has been established. Forrest v. Brinker International Payroll Co., LP, 511 F.3d 225, 228 (1st Cir. 2007) (internal quotation marks and citation omitted). Defendants contend that the incidents Plaintiff complains of are neither subjectively nor objectively severe or pervasive. In essence, the extent of Plaintiff's response is that "[o]ver the course of [her] relatively brief employment with [the Department] . . . to its abrupt ending, the various incidents alleged . . . that she both experienced or witnessed, could be sufficient for a jury to conclude that the severe and pervasive element of the legal standard is met." Plaintiff's Memorandum in Opposition to Summary Judgment at 21 (emphasis added). See generally United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990) (it is not the job of the Court to "put flesh" on counsel's argument). Notwithstanding Plaintiff's failure to develop her argument sufficiently, the Court must view the record in the light most favorable to Plaintiff and evaluate Plaintiff's alleged incidents of hostile

11

work environment in order to determine whether those incidents satisfy the standard as a matter of law.

To succeed on her claim, Plaintiff must show that her "workplace [was] permeated with discriminatory intimidation, ridicule, and insult that [was] sufficiently severe or pervasive to alter the conditions of . . . employment and create an abusive working environment." Rios-Jimenez v. Principi, 520 F.3d 31, 43 (1st Cir. 2008) (internal quotation marks and citation omitted). Courts have recognized that there is no precise test to determine whether a plaintiff has met this burden and evaluate a plaintiff's allegations and all the circumstances while "considering the frequency of the discriminatory conduct; its severity; whether it was physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interfered with an employee's work performance." Carmona-Rivera v. Puerto Rico, 464 F.3d 14, 19 (1st Cir. 2006) (internal quotation marks and citation omitted). "[S]imple teasing . . . offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment." Faragher v. City of Boca Raton, 524 U.S. 775, 788 (1998) (internal quotation marks and citation omitted). Harassment directed at others that Plaintiff knew about may be considered in evaluating Plaintiff's claim of hostile work environment. Brissette v. Franklin County Sheriff's Office, 235 F. Supp. 63 (D. Mass. 2003) (state law hostile work environment claim).

Title VII, however, is not a civility code; in order to be actionable under Title VII the complained of conduct must be extreme. Faragher, 524 U.S. 788. Courts must use common sense and "an appropriate sensitivity to social context" in distinguishing between innocuous behavior and severely hostile or abusive conduct. Kosereis v. Rhode Island, 331 F.3d 207, 216

(1st Cir. 2003) (internal quotation marks and citation omitted). The "objective severity of harassment should be judged from the perspective of a reasonable person in the plaintiff's position, considering all the circumstances." Oncale v. Sundowner Offshore Svs. Inc., 523 U.S. 75, 81 (1998) (internal quotation marks and citation omitted).

The instances that Plaintiff experienced include three incidents of physical contact coupled with four comments by Blakey: that he needed a "personal touch" in his office (while rubbing Plaintiff's back and shoulders); whether Plaintiff desired a larger T-shirt for her boyfriend (while placing the T-shirt against her back); that a firefighter believed Plaintiff to have a "nice ass"; and that Plaintiff was "pretty" and "beautiful" (while rubbing her cheek with his hand). Although the record is not clear as to the specific timing of all of these incidents, viewing the matter in the light most favorable to Plaintiff, these instances occurred in a span of less than a year.

The record reflects that Plaintiff experienced both unwanted physical contact and inappropriate comments. The Court recognizes that, for the most part, physical contact is inappropriate for the workplace. Physical harassment, however, like verbal harassment lies along a continuum and some forms of physical contact are minor when compared to other more invasive, forceful, and/or crude contact. See generally Patton v. Keystone RV Co., 455 F.3d 812 (7th Cir. 2006) (hand on shoulder, brief hug, peck on the cheek not likely to create hostile work environment in absence of aggravating circumstances); Lacadie v. Town of Milford, Civ. No. 07-101-B-W, 2008 WL 1930410 (D. Me. May 1, 2008) (same), report and recommendation adopted, 2008 WL 2510163 (D. Me. June 19, 2008). Considering the incidents of physical contact and inappropriate comments that Plaintiff experienced and the incidents that Plaintiff witnessed and

heard about[6] as a whole, the Court finds that no reasonable jury could conclude that Plaintiff has

shown a workplace that was "permeated" with discriminatory behavior that was sufficiently severe

or pervasive to alter the conditions of employment. Rios-Jimenez, 520 F.3d at 43.  The

inappropriate conduct by Blakey was "episodic, but not so frequent as to become pervasive [and

was not] severe. . . ." Lee-Crespo v. Schering-Plough Del Caribe Inc., 354 F.3d 34, 46 (1st Cir.

2003).  While the Court does not condone what can only be described as inappropriate,

unprofessional, and boorish behavior by Blakey, that behavior is not sufficient to establish a hostile

work environment claim.  Viewing these incidents in the totality of the circumstances, the Court

concludes that Plaintiff's claim of a hostile work environment is insufficient to pass the baseline

threshold of sufficiently severe or pervasive.

### B.  Retaliation & Rhode Island Whistleblowers' Protection Act

Plaintiff contends that Defendants violated Title VII because her termination was in

retaliation for exercising her right to complain about sexual harassment.  Defendants contend that

Plaintiff was terminated because of her deficient job performance.

The prima facie elements of a retaliation claim are that (1) plaintiff engaged in protected

conduct; (2) plaintiff suffered an adverse employment action; and (3) the adverse action is causally

connected to the protected conduct. Fantini v. Salem State College, 557 F.3d 22 (1st Cir. 2009).[7]

---

[6]At least one of the incidents that Plaintiff heard about occurred before Plaintiff was hired.  See generally Paquin v. MBNA Marketing Systems, Inc., 233 F. Supp. 2d 58, 64 n.1 (D. Me. 2002) (incidents occurring before plaintiff started work not relevant to plaintiff's sexual harassment claim).  As noted above, however, even if this incident is considered in the totality of circumstances, the behavior complained of is not sufficient to pass the baseline threshold of sufficiently severe or pervasive.

[7]"Similarly, an employee claiming she was fired as a result of reporting a violation under [RIWPA] must also demonstrate a causal connection between her report and her termination." Babbitt, 2009 WL 3450959 at *6 (analyzing Title VII retaliation claim and RIWPA claim together).  Plaintiff agrees that "essentially the same standard" applies to both the Title VII retaliation claim and the RIWPA claim.  Plaintiff's Memorandum in Opposition to Summary Judgment at 18.  The Court analyzes the RIWPA claim and the Title VII retaliation claim

Where there is no direct evidence of retaliation, the Court analyzes the claim under the familiar McDonnel Douglas rubric. Ramirez Rodriguez v. Boehringer Ingelheim Pharmaceuticals, Inc., 425 F.3d 67 (1st Cir. 2005); King v. Town of Hanover, 116 F.3d 965 (1st Cir. 1997). Once a plaintiff satisfies the elements of a prima facie case of retaliation, the burden shifts to the defendant to articulate a legitimate, non-discriminatory reason for the employment action. Id. If the defendant presents such a reason, Plaintiff must show that the employer's proffered reason is a pretext for retaliatory discrimination. Id. To survive summary judgment on a retaliation claim Plaintiff must "point to evidence in the record that would permit a rational factfinder to conclude that the employment action was retaliatory." King, 116 F.3d at 968.

Plaintiff contends that once she complained about what she perceived as sexual harassment by Blakey, her probationary extension was almost immediately rescinded and she was terminated shortly thereafter. Plaintiff was interviewed as a part of the investigation into the allegations against Blakey in or about late October 2006. "Reporting sexual harassment or initiating a charge of sexual harassment is a protected activity under Title VII." Dressler v. Daniel, 315 F.3d 75, 78 (1st Cir. 2003). It is undisputed that Plaintiff suffered an adverse employment action, i.e., termination. Defendants argue that Plaintiff's case fails because she cannot show causation. Plaintiff argues that a triable issue as to causation exists because the rescission of the probationary extension and termination occurred almost immediately after Plaintiff complained of Blakey's alleged sexual harassment.

Depending on the particular facts, "temporal proximity alone can suffice to meet the relatively light burden of establishing a prima facie case of retaliation." DeCaire v. Mukasey, 530

together. See id.

F.3d 1, 19 (1st Cir. 2008) (internal quotation marks and citation omitted).  If temporal proximity is the only evidence establishing causation, the proximity must be very close.  Bishop v. Bell Atlantic Corp., 299 F.3d 53 (1st Cir. 2002).  In determining whether causation exists, however, courts should consider the actions taken against the employee within the overall context and sequence of events.  See generally Soileau v. Guilford of Maine, Inc., 105 F.3d 12 (1st Cir. 1997); Vargas v. Puerto Rican-American Insurance Co., 52 F. Supp. 2d 305, 313-314 (D.P.R. 1999) (courts should consider the overall context and sequence of events and the "historical background of the decision, any departures from normal procedure, and contemporary statements by the employer's decision makers").  "[C]hronological proximity does not by itself establish causality, particularly if [t]he larger picture undercuts any claim of causation . . . ."  Wright v. CompUSA, Inc., 352 F.3d 472, 478 (1st Cir. 2003) (internal quotation marks and citation omitted).

The Court places Defendants' decision to terminate Plaintiff's employment in proper context.  As a result of the investigation and suspension of Blakey, Steckman was forced into the forefront of making personnel decisions for the Department.  Steckman testified that at some point in the Fall of 2006, Maltais approached him about Plaintiff's anniversary date.  Steckman believed that he had to make a decision concerning Plaintiff's employment status because (1) he was aware that Plaintiff's probationary period was coming to an end; and (2) he had been informed by legal counsel that Blakey did not have the unilateral authority to extend Plaintiff's probationary period and that a police officer's "rights" change after one year of employment.

The record reflects that Plaintiff's documented employment history with the Department was unsatisfactory.  Steckman testified that after he reviewed Plaintiff's personnel record as part of the sexual harassment investigation he was convinced that her employment should be terminated

16

because of her deficient performance. As Plaintiff notes, it is clear that Steckman's review of her

personnel record and his decision to terminate her occurred *after* she complained about Blakey's

behavior. What Plaintiff ignores, however, is that when Plaintiff complained of Blakey's conduct

in or about late October 2006, a decision concerning whether Plaintiff was qualified to become a

permanent member of the Department had, in essence, already been made. Blakey decided to

extend Plaintiff's probationary period at the end of August 2006, clearly telegraphing to Plaintiff

(and other officers) that the Department was not satisfied with her progress during her probationary

period. That decision, made a month and a half before Plaintiff complained of Blakey's conduct,

was a clear and unequivocal determination that Plaintiff would not successfully complete the

probationary period in the allotted time period and that she was not then qualified to become a

permanent member of the Department. "[P]roceeding along lines previously contemplated, though

not yet definitively determined, is no evidence whatever of causality." Clark County School

District v. Breeden, 532 U.S. 268, 272 (2001) (per curiam); see generally Horne v. Reznick Fedder

& Silverman, 154 F. App'x 361 (4th Cir. 2005) (inference of causation rebutted because prior to

protected activity employee was told that her performance was sub-par and that she should prepare

to leave). Blakey's decision that Plaintiff was not qualified to become a permanent member of the

Department was made well before Plaintiff's sexual harassment allegations, clearly defeating any

causal link between Steckman's decision to terminate Plaintiff and Plaintiff's allegations.

Furthermore, Plaintiff fails to address the fact that the decision to terminate her was not made by

Blakey but by a different supervisor. See generally Alston v. Rice, 825 F. Supp. 650 (D. Del.

1993) (retaliation claim failed, in part, because plaintiff failed to show causal link between

complaint against one supervisor and discharge by different supervisor).

Finally, Steckman's actions in relation to Blakey wholly undermine Plaintiff's claim. Steckman instituted the investigation into the allegations against Blakey and concluded that Blakey should be terminated.  It belies common sense to conclude that the individual who instituted the investigation would terminate Plaintiff *because* she participated in the very investigation he instituted.

### C.  Disparate Treatment

Plaintiff claims that she was subjected to disparate treatment based upon her gender during her training.  She alleges that the disparate treatment made her unable to complete her probationary period which led to the termination of her employment.  Defendants argue that they are entitled to judgment on this claim.

Like her retaliation claim, Plaintiff's disparate treatment claim must be analyzed pursuant to the McDonnell Douglas framework.  Smith v. Stratus Computer Inc., 40 F.3d 11 (1st Cir. 1994). According to the McDonnell Douglas sequence, Plaintiff bears the initial burden of establishing a prima facie case of gender discrimination.  Id.  In order to establish her prima facie case of gender discrimination based on disparate treatment, Plaintiff must show that (1) she is a member of a protected class; (2) she was performing her job at a level that rules out the possibility that she was fired for inadequate job performance; (3) her employer took an adverse job action against her; and (4) her employer sought a replacement with roughly equivalent qualifications.  Id.; see also Douglas, 422 F. Supp. 2d at 273.  If Plaintiff meets this "relatively light burden," the Court presumes the employer engaged in impermissible gender discrimination.  Smith, 40 F.3d 15.  If, however, the employer articulates a legitimate, non-discriminatory reason for its decision, the presumption dissipates and the burden of production shifts back to Plaintiff.  Id.  At this juncture,

Plaintiff must produce sufficient evidence to show that (1) the employer's reason is pretext, and (2) that the true reason for the job action is discrimination. Id. "[I]n disparate treatment cases, comparative evidence is to be treated as part of the pretext analysis, and not as part of the plaintiff's prima facie case." Kosereis v. Rhode Island, 331 F.3d 207, 213 (1st Cir. 2003).

For purposes of the disparate treatment analysis, the Court assumes without deciding that Plaintiff has met her prima facie burden. Defendants have articulated a non-discriminatory reason for Plaintiff's termination of employment: Plaintiff's job performance during her probationary period was unsatisfactory. As noted, at the third stage of the McDonnel Douglas framework, in order to show pretext in a disparate treatment case, Plaintiff must present sufficient evidence to show that persons similarly situated were treated differently. Kosereis, 331 F.3d at 214 (to "successfully allege disparate treatment, a plaintiff must show that others similarly situated to [her] in all relevant respects were treated differently by the employer") (internal quotation marks and citation omitted).

In order to determine whether Plaintiff's comparitors are similarly situated, the Court must examine "whether a prudent person, looking objectively at the incidents, would think them roughly equivalent and the protagonists similarly situated." Perkins v. Brigham & Women's Hospital, 78 F.3d 747, 751 (1st Cir. 1996) (internal quotation marks and citation omitted). Examples of disparate treatment "need not be perfect replicas, [but] they must closely resemble one another in respect to relevant facts and circumstances." Conward v. Cambridge School Committee, 171 F.3d 12, 20 (1st Cir. 1999). Plaintiff must identify male employees who "have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it."

19

Rodriguez-Cuervos v. Wal-Mart Stores, Inc., 181 F.3d 15, 21 (1st Cir. 1999) (internal quotation

marks and citation omitted).

     As noted, during her tenure with the Department, Plaintiff was a probationary employee.

"A probationary period of employment permits [an employer] to weed out or eliminate undesirable

employees."  Cooper v. City of North Olmstead, 795 F.2d 1265, 1270 (6th Cir. 1986).  Plaintiff's

allegations of disparate treatment include comparisons between herself and non-probationary or

permanent members of the Department.  Although the First Circuit has not addressed the issue,

other circuits (and the District of Massachusetts) have held that probationary employees and non-

probationary or permanent employees are not similarly situated in the employment context.[8]  On

the particular facts of this case, however, the application of this "inflexible rule . . . would

automatically doom" Plaintiff's claim.  See generally Pantoja v. American NTN Bearing

Manufacturing Corp., 495 F.3d 840, 846 (7th Cir. 2007).  This Court therefore considers Plaintiff's

evidence as it relates to both non-contemporaneous probationary officers and permanent officers

who were not disciplined for the same infractions for which Plaintiff was disciplined.  Feingold,

366 F.3d 138 (2d Cir. 2004).

---

     [8]See Majahad v. Reich, 915 F. Supp. 499, 502 (D. Mass. 1996); Bogren v. Minnesota, 236 F.3d 399 (8th Cir. 2000) (police officer beyond probationary period is not similarly situated to a probationary police officer); Blanding v. Pennsylvania State Police, 12 F.3d 1303 (3d Cir. 1993) (tenured police officer not similarly situated to probationary police officer); Stenhauer v. DeGolier, 359 F.3d 481, 485 (7th Cir. 2004) (parties "were not similarly situated because [plaintiff] was still on probation while [the comparitor] was not"); Cooper, 795 F.2d at 1271 (probationary employees are not similarly situated to permanent employees); Green v. New Mexico, 420 F.3d 1189, 1195 (10th Cir. 2005) (comparitor with different supervisor and not a probationary employee was not similarly situated); McMillan v. Bair, 304 F. App'x 876 (D.C. Cir. 2008) (probationary trainees not similarly situated to permanent employees for purposes of Title VII when employer decides to retain or dismiss the probationary employee); but see Feingold v. New York, 366 F.3d 138, 153 (2d Cir. 2004) (recognizing that permanent and probationary employees are not similarly situated with respect to conditions under which they could be terminated; nevertheless, where evidence showed members of one race "were not disciplined at all" for conduct at issue, discriminatory motive could be inferred).

Plaintiff points to several instances where she was allegedly treated differently than other officers. It is, however, unclear from the record which instances are specifically disputed by Defendants and whether Plaintiff's allegations are based on admissible evidence. On this record, the Court cannot say that Defendants have met their burden of demonstrating that they are entitled to judgment as a matter of law on Plaintiff's disparate treatment claim. Accordingly, Defendant's motion for summary judgment on this claim is denied.

## IV. Conclusion

Based upon the Court's analysis, Defendants' motion for summary judgment is GRANTED as to Plaintiff's hostile work environment and retaliation claims and DENIED as to Plaintiff's disparate treatment claim.

SO ORDERED

_Mary M. Lisi_
Mary M. Lisi
Chief United States District Judge
June _2_, 2010